UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAIME FERNANDEZ,<br><br>Defendant. | No.  2:16-CR-00115-KJM<br><br><br>ORDER |

Defendant, initially appearing pro se, moves for compassionate release from incarceration under 18 U.S.C. § 3582(c).  He argues the coronavirus ("COVID-19") poses an extraordinary risk to his health as a person housed at FCI Lompoc, who was previously infected with the coronavirus, suffers from asthma, chronic kidney disease, hypertension and of his high body mass index (BMI).  Pro Se Mot., ECF No. 85.  Court appointed counsel filed two supplemental motions to reduce defendant's sentence.  First Suppl. Mot., ECF No. 89; Sec. Suppl. Mot., ECF No. 95.  The government opposes, Opp'n, ECF No. 91, and defendant has replied, Reply, ECF No. 93.  For the following reasons, the court GRANTS defendant's motion for compassionate release and GRANTS defendant's requests to seal defendant's medical records and release plan questionnaire, ECF Nos. 88 & 94.

1

1   I.      BACKGROUND

2               On January 11, 2017, defendant, by way of a written plea agreement, pled guilty to

3   Count 1 of the Indictment, conspiracy to distribute and possess with intent to distribute

4   methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1).  Indictment, ECF No. 13; Mins. of

5   Change of Plea Hr'g, ECF No. 33.  Defendant has been incarcerated at FCI Lompoc[1] since

6   May 5, 2017.  Opp'n, Ex. 1 ("Public Inmate Data"), ECF No. 91-1, at 2–3.  As of this writing,

7   defendant has served 56 months of his 120-month sentence.  *Id*. at 3.  The BOP calculated

8   defendant's projected release date as December 14, 2024, through application of good time credit,

9   and defendant is eligible for home detention beginning June 14, 2024.  *Id*. at 3–4 (noting as of

10  filing of motion defendant has served four years, two months, six days, or 49.1 percent of his

11  statutory term).

12          A.      Defendant's Medical Conditions

13              On July 13, 2020, defendant filed the instant motion for compassionate release

14  under 18 U.S.C. § 3582(c)(1)(A), arguing his history of asthma, diabetes and obesity makes him

15  particularly susceptible to developing serious complications from a COVID reinfection and,

16  paired with the coronavirus outbreak at the facility where he is housed, "extraordinary and

17  compelling reasons" warrant compassionate release.  Pro Se Mot. at 1; First Suppl. Mot., Ex. A

18  ("Medical Records");[2] Not. of Req. to Seal, ECF No. 88.

19              Defendant's medical records document defendant's medical conditions as:

20  hyperlipidemia, asthma, chronic kidney disease, hypertension and body mass index (BMI) 35.0-

21  _____

22              [1] The court notes, defense counsel writes defendant is "incarcerated at USP Lompoc" *see*
    First. Suppl. Mot. at 8; however, the record shows defendant is housed at FCI Lompoc.  *See*

23  Release Plan Questionnaire (sealed) (documenting defendant resides at "FCI Lompoc 3600 Guard
    Rd. Lompoc CA 93436").  The Federal Correctional Complex FCI Lompoc where defendant is

24  housed is a minimum-security federal prison camp, part of a larger complex with USP Lompoc.

        [2] Defendant submitted this record *in camera* and requested the court seal it due to the

25  sensitivity of defendant's medical records.  ECF No. 88.  The court GRANTS defendant's request
    to seal Exhibit A and directs the Clerk to file this document under seal concurrently with this

26  order.  The medical records document defendant's medical encounters at BOP Health Services
    from January 1, 2020 to December 31, 2020, including, in reverse chronological order, on July 2,

27  June 6, June 5, June 4, May 5, March 16, March 11, February 25 and January 7, 2020.  *See*

28  *generally* Medical Records (sealed).

35.9.  Medical Records at 37, 50 (sealed).  Medical records also indicate defendant tested positive

for COVID on May 6, 2020 and his recent symptoms of "shortness of breath could be due to

resolving Covid disease or possible panic/anxiety issues," due to "defendant's fellow dorm-

mate['s] . . . sudden death the week prior," *id.* at 4–5 (noting numerous inmates have had anxiety

over that incident).

### B.    Conditions at FCI Lompoc

The parties do not dispute the coronavirus outbreak at FCI Lompoc is one of the

worst outbreaks in the nation.  Opp'n at 6 (citing *United States v. Robinson*, No. 18-CR-596,

2020 WL 1982872, at *1 (N.D. Cal. Apr. 27, 2020); *United States v. Curtiss*, No. 18-CR06064,

2020 WL 3146506 (W.D. New York June 15, 2020) and *United States v. Purry*, 2020 WL

2773477, at *2 (D. Nev. May 28, 2020)).   As of this writing, FCI  Lompoc has reported 3 staff

tested positive, 2 inmate deaths, 746 inmates designated as recovered and 16 staff members

designated as recovered at that institution. Opp'n at 6 (citing BOP, *COVID-19 Cases* (updated

daily)).[3] Moreover, the BOP reports 902 of the 1,846 individuals collectively incarcerated at FCI

and USP Lompoc combined have tested positive for COVID.  First Suppl. Mot. at 11 (citing

BOP, *COVID-19 Cases* (updated daily); BOP, *General Inmate Population Reports*).[4]

### C.    Administrative Remedies

On June 18, 2020, defendant submitted a request for compassionate release to the

warden at FCI Lompoc, Opp'n at 4, which the warden denied on April 24, 2020, BOP Denial

Letter, ECF No. 85, at 8.  The government does not dispute defendant has exhausted his

administrative remedies and satisfied the statutory requirement in 18 U.S.C. § 3582(c)(1).  Opp'n

at 4.  The court thus SUBMITS defendant's motion and resolves it here.

---

[3] As have other courts, this court takes judicial notice of the information presented by the BOP at https://www.bop.gov/coronavirus/ (last accessed October 2, 2020).  *See United States v. Daniels*, No. 19-CR-00709-LHK (NC), 2020 WL 1815342, at *3 (N.D. Cal. Apr. 9, 2020).

[4] https://www.bop.gov/about/statistics/population_statistics.jsp (last accessed October 2, 2020).

1    II.      LEGAL STANDARD

2           A sentencing court has authority to modify a term of imprisonment under

3    18 U.S.C. § 3582(c)(1)(A).  Under that statute, as amended by the First Step Act of 2018, Pub. L.

4    No. 115-391, 132 Stat. 5194 (Dec. 21, 2018), the court may grant a defendant's motion to reduce

5    his term of imprisonment, provided the defendant has first satisfied an exhaustion requirement,

6    "after considering the factors set forth in section 3553(a) to the extent that they are applicable," if

7    "extraordinary and compelling reasons warrant such a reduction," and if "a reduction is consistent

8    with applicable policy statements issued by the Sentencing Commission."  18 U.S.C.

9    §§ 3582(c)(1)(A), 3582(c)(1)(A)(i).

10          Many years ago—before the First Step Act and before defendants could move to

11   reduce their sentences under § 3582—the Sentencing Commission issued a policy statement

12   addressing what qualifies as "extraordinary and compelling reasons" under § 3582.  *See* U.S.S.G.

13   § 1B1.13.  The same Guidelines section also "imposes an additional consideration of whether the

14   defendant is a danger to the safety of any other person or to the community."  *United States v.*

15   *Numann*, No. 3:16-CR-00025-TMB, 2020 WL 1977117, at *2 (D. Alaska Apr. 24, 2020) (citing

16   U.S.S.G. § 1B1.13(2)).

17          Since the First Step Act was passed, district courts have disagreed about whether

18   the Sentencing Commission's statement is binding.  Some courts have determined that the

19   statement "no longer fits with the statute," *United States v. Cantu*, 423 F. Supp. 3d 345, 351 (S.D.

20   Tex. 2019), because it does not account for a defendant's ability to move for compassionate

21   release, *see United States v. Allen*, No. 2:17-CR-0229-TOR-12, 2019 WL 6529113, at *2 (E.D.

22   Wash. Dec. 4, 2019); *see also United States v. Willingham*, No. CR113-010, 2019 WL 6733028,

23   at *2 (S.D. Ga. Dec. 10, 2019) (noting "[i]n at least four judicial districts, courts have determined

24   that the First Step Act signaled an intent from Congress that district courts may now consider

25   whether extraordinary and compelling reasons for compassionate release exist other than those

26   delineated in U.S.S.G. § 1B1.13 n.1" (citations omitted)).  A strong contingent of decisions issued

27   by district courts within the Ninth Circuit has indeed concluded that the Guidelines are no longer

28   limiting and that the sentencing court has complete discretion to decide what counts as

4

1   "extraordinary and compelling" reasons. *See, e.g.*, *United States v. Rodriguez*, No. 17-cr-00021-

2   WHO-1, 2019 WL 6311388, at \*7 (N.D. Cal. Nov. 25, 2019) ("This court follows the growing

3   number of district courts that have concluded that, in the absence of applicable policy statements,

4   courts can determine whether any extraordinary and compelling reasons other than those

5   delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) warrant compassionate release."); *United States*

6   *v. Chan*, No. 96-cr-00094-JSW-13, 2020 WL 1527895, at \*4–5 (N.D. Cal. March 31, 2020)

7   (noting split in authority and following *Rodriguez*); *United States v. Parker*, No. 2:98-CR-00749-

8   CAS-1, 2020 WL 2572525, at \*8–9 (C.D. Cal. May 21, 2020) (collecting cases finding U.S.S.G.

9   § 1B1.13 is no longer limiting but considering the policy statement as guidance).

10          But many courts in this circuit still turn section 1B1.13 for "guidance on the

11   'extraordinary and compelling reasons' that may warrant a reduction in sentence." *United States*

12   *v. Esparza*, No. 1:07-CR-00294-BLW, 2020 WL 1696084, at \*2 n.2 (D. Idaho Apr. 7, 2020)

13   (quoting *United States v. Gonzalez*, No. 2:18-CR-0232-TOR-15, 2020 WL 1536155, at \*2 (E.D.

14   Wash. March 31, 2020)); *see also Riley v. United States*, No. C19-1522 JLR, 2020 WL 1819838,

15   at \*8 (W.D. Wash. Apr. 10, 2020) ("In the absence of contrary controlling authority, and given

16   the limited statutory exceptions to the general rule of the finality of judgments, this court will

17   continue to follow the guidance of the Sentencing Commission's policy statement limiting the

18   scope of "extraordinary and compelling reasons" that warrant compassionate release under

19   § 3582(c)(1)." (citing *Dillon v. United States*, 560 U.S. 817, 827 (2010))), *appeal filed*,

20   No. 20-35334 (April 13, 2020).

21          This court has looked to the Sentencing Commission's policy statement as

22   guidance in several previous orders and will do the same here, *see, e.g.*, *United States v.*

23   *Schweder*, No. 11-00449-KJM, 2020 WL 5257598, at \*3 (E.D. Cal. Sept. 3, 2020); the court need

24   not decide whether that statement is binding.

25   /////

26   /////

27   /////

28   /////

5

1    III.    DISCUSSION

2          A.    Exhaustion

3                Defendant must meet the exhaustion requirements of § 3582 before the court can

4    consider his motion for compassionate release.  As evidenced by the warden's denial letter

5    attached to defendant's motion, defendant submitted a request for reduction in sentence on June

6    18, 2020.  *See generally* BOP Denial Letter.  As previously noted, the government does not

7    dispute defendant has satisfied the exhaustion requirement.  Opp'n at 4.  The court finds the

8    exhaustion requirement is met here.  Accordingly, the court proceeds to consider the merits of the

9    motion.

10         B.    "Extraordinary and Compelling Reasons"

11               Defendant argues his health issues make him particularly susceptible to developing

12   serious complications from a COVID-19 reinfection.  First Suppl. Mot. at 9.  At FCI Lompoc

13   where defendant is housed, at the time of defendant's filing, 963 prisoners had undergone a round

14   of mass testing, with 882 reporting positive as of May 6, 2020.  *Id*. at 11.  Defendant argues these

15   high numbers of people testing positive for COVID at his facility paired with his medical history

16   as described above, constitute "extraordinary and compelling reasons" warranting compassionate

17   release.  *Id*.  He says the fact defendant once before survived a COVID-19 infection suggests he is

18   likely to be reinfected if he continues to be housed within FCI Lompoc, without the ability to

19   socially distance or self-care.  *Id*. at 18.  The government counters: (1) defendant's "mild case of

20   the coronavirus" and his recovery is an "extremely positive sign for him . . . [because he] has

21   endured the illness seemingly without substantial adverse health outcomes," Opp'n at 12; and (2)

22   defendant has not met his burden in light of the § 3553(a) factors to show he is not a danger to the

23   community, *id.* at 8.  The court addresses these arguments below.

24               1.    Defendant's Risk of Reinfection

25               Defendant's clinical encounter on June 6, 2020 shows he was diagnosed positive

26   for COVID-19 on May 6, 2020.  Medical Records at 4.  Courts are divided on the question of

27   whether compassionate release is warranted after a defendant has ostensibly recovered from a

28   COVID-19 infection.  Some courts have found, in light of the scientific uncertainty surrounding

6

society's present understanding of COVID-19, a previous infection cuts against compassionate release.  *See, e.g., United States v. Molley*, No. CR15-0254-JCC, 2020 WL 3498482, at *2 (W.D. Wash. June 29, 2020) ("releasing uninfected inmates mitigates the concrete risk of them getting infected, releasing [defendant] would reduce the risk of him getting reinfected.  That risk is . . . speculative.").  Other courts have opted to "err on the side of caution to avoid potentially lethal consequences for [defendant]" because "simply announcing that an inmate has 'recovered' does not mean [defendant] is completely safe from the virus."  *United States v. Armstrong*, No. 18-CR-5108-BAS-1, 2020 WL 4366015, at *3 (S.D. Cal. July 30, 2020) (internal quotations and citation omitted) (finding "particularly persuasive that an inmate, being housed at the same facility as [defendant], was hospitalized and died after he was pronounced 'recovered' by the BOP.")

Given the evolution in scientific understanding of whether reinfection is possible or how long any COVID-19 immunity lasts, experts appear to agree that to preserve the lives of people who live and work at both FCI and USP Lompoc, the population must be reduced to permit prisoners there to physically distance.  *See* First Suppl. Mot., Ex. B ("Samra Decl."), ECF No. 89-1, at 2–14[5]; First. Suppl. Mot., Ex. C ("Stern Decl."), ECF No. 89-2, at 2–12.[6] Dr. Samra, in particular, explains:

> To the extent . . . prisoners have actually recovered from [COVID], [] does not absolve the need for preventive measures . . . [C]lassifying prisoners as "recovered" without re-testing them, [] would be very problematic.  Indeed, the need for continued rigorous preventive measures is only heightened if BOP has not relied on appropriate methods for determining whether prisoners have in fact recovered.  In an ideal scenario, an individual would only be deemed "recovered" after testing negative . . . And in a large communal living space, where social distancing cannot be strictly adhered to,

[5] Dr. Samra is Assistant Professor of Clinical Medicine at University of California, Los Angeles and a faculty member in the Department of Emergency Medicine at Harbor-UCLA.  Samra Decl. ¶ 1.

[6] Dr. Stern is a board-certified physician specializing in correctional health care.  Most recently, he served as the Assistant Secretary for Health Care at the Washington State Department of Corrections.  Stern Decl. ¶ 1.

individuals should be tested regularly in order to quickly identify and isolate anyone who may contract COVID-19 before it spreads through the population.

Samra Decl. ¶¶ 15–16.  Here, the BOP simply classified defendant as "recovered" without re-testing him.  First Suppl. Mot. at 16 (noting as with rest of country, BOP has very few or no actual COVID-19 test packets).

Considering the high level of infection at FCI and USP Lompoc, the lack of scientific certainty regarding whether reinfection is possible after a purported recovery or negative test, or whether COVID-19 immunity lasts, coupled with defendant's prior infection and his multiple health conditions, this court errs on the side of caution and finds defendant's specific risk of reinfection appears to be heightened at FCI Lompoc. *See United States v. Yellin*, No. 3:15-CR-3181-BTM-1, 2020 WL 3488738, at *2 (S.D. Cal. June 26, 2020) (granting compassionate release of inmate with underlying medical conditions who was infected with COVID-19, but did not develop severe symptoms, because, among other things, inmates were not tested for COVID-19 unless they displayed symptoms and risk that reinfection would have on the inmate's health).  Accordingly, despite his having had COVID-19, defendant may still be able to show "extraordinary and compelling reasons" support his request for release based on his pre-existing conditions.

2.      Implications of Defendant's Medical History

Defendant's medical records confirm defendant continues to suffer from and receives treatment for asthma, chronic kidney disease and obesity, Opp'n at 10 (relying on Medical Records at 31, 50 (under seal)).  Factually, the government does not challenge defendant's suffering from any of the health conditions he identifies.  *Id*.  The government does, however, dispute defendant's asthma is a risk factor that "might" lead to "an increased risk" of COVID-19 complications.  Opp'n at 10 (citing CDC, *People Who are at Increased Risk for Severe Illness*[7] (noting "moderate to severe" asthma is the only category of asthma recognized by

---

[7] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last updated September 11, 2020) (last accessed October 2, 2020).

the CDC as risk factor for COVID-19)); *see also* CDC, *People with Certain Medical Conditions*.[8]
Nevertheless, the government ultimately appears to concede defendant's chronic kidney disease
stage 2 and obesity are chronic health conditions that "technically involve an increased risk of
severe illness from COVID-19, as set forth by the Centers for Disease Control."  Opp'n at 10 &
n.2 ("A BMI above 30 is identified by the Centers for Disease Control as a high-risk factor for
COVID-19 complication.").[9]

While the CDC only expressly lists "moderate to severe" asthma as a specific risk
factor for complications from COVID-19, defendant provides the court with legal authorities
demonstrating the risks associated with asthma generally.  *See* First Suppl. Mot.  Other district
courts have found asthma, obesity and chronic kidney disease stage 2[10] individually and as
comorbidities constitute medical conditions that increase the risk of severe illness from
coronavirus warranting compassionate release.  The medical records defendant submits
corroborate his medical diagnoses of asthma, chronic kidney disease, hypertension and obesity.
Medical Records at 37, 50 (sealed).

- Asthma and obesity, *see, e.g., United States v. Rodriguez*, No. 3:17-CR-4477-BTM, 2020 WL 4592833, at *1 (S.D. Cal. Aug. 5, 2020) (granting motion for compassionate release for petitioner suffering from asthma and obesity);

---

[8] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last updated September 11, 2020) (last accessed October 2, 2020).

[9] *See* CDC, *People Who are at Increased Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last updated September 11, 2020) (last accessed October 2, 2020).

[10] *See United States v. Iezzi*, No. 2:17-CR-00157, 2020 WL 4726582, at *2 n.2 (W.D. Pa. Aug. 14, 2020) (describing stages of chronic kidney disease: at stage II, an individual's kidneys function at 60–89 percent, which does not require radical treatment) (citing the National Kidney Foundation, *What are the Stages of Chronic Kidney Disease?*, https://www.kidney.org/es/node/25721)) (accessed October 2, 2020).

- Hypertension and chronic kidney disease, *see also United States v. Johnson*, No. CR 4:16-577-BHH-1, 2020 WL 4501513, at *5 (D.S.C. Aug. 5, 2020) (granting motion for compassionate release for inmate suffering from hypertension and chronic kidney disease, finding chronic kidney disease at "any stage is . . . a serious . . . medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover").

As to the government's argument defendant's "recovery from a mild case of COVID-19 underscores . . . his combination of health concerns and age of 41" would not lead to serious complications if he is reinfected, Opp'n at 12, defendant contends "incarcerated individuals tend to be in poorer health than those in the general population, justifying the use of an earlier [age] cutoff in classifying people deemed vulnerable to COVID-19." Stern Decl. ¶ 7. While the court does not adopt the categorical rule defendant suggests regarding age, the court finds as it did before in *United States v. Bradley*, "defendant's combination of serious health conditions weighs heavily in favor of a sentence reduction." No. 2:14-CR-00293-KJM, 2020 WL 3802794, at *5 (E.D. Cal. July 7, 2020). Here, as well, the court finds defendant's combination of serious health conditions weighs heavily in favor of a sentence reduction.

### 3.   Defendant's Current Placement

The particular conditions at FCI Lompoc heighten the potential lethality of defendant's exposure to COVID-19. Defendant avers living conditions at FCI Lompoc are particularly dire because, at the time he filed the pending motion, a third of the prisoners have tested positive for COVID-19 and undoubtedly there are more infected prisoners who have not been tested. First. Suppl. Mot. at 17. As of the time of this writing, 3 staff have tested positive, 2 inmates have died, 746 inmates were designated as recovered and 16 staff members also were designated as recovered at that institution. *See* BOP, *COVID-19 Cases* (updated daily) (accessed October 2, 2020).

/////

10

1    The CDC recommends individuals with chronic kidney disease, obesity, asthma

2  and hypertension protect themselves from COVID-19, by, *inter alia*: "keep[ing] space between

3  yourself and others," "stay[ing] home," and "[c]lean[ing] your hands often by washing with soap

4  and water or using an alcohol-based sanitizer."  CDC, *How to Protect Yourself & Others* (last

5  updated April 24, 2020).[11]  The recommendations emphasize that "[k]eeping distance from others

6  is especially important for people who are at higher risk of getting very sick."  *Id.*

7    In its opposition, the government submits a declaration provided in late May by

8  the Health Services Administrator for FCI Lompoc and USP Lompoc, explaining the isolation,

9  monitoring and treatment practices at Lompoc.  Opp'n at 6 (citing *United States v. Eddings*,

10  No. 2:09-CR-00074-JAM-AC, 2020 WL 2615029, at *2 (E.D. Cal. May 22, 2020) ("Government

11  submitted a compelling and detailed declaration from the Health Services Administrator at

12  Lompoc, detailing the treatment [d]efendant is currently receiving and the measures the facility is

13  implementing to battle its current COVID-19 outbreak")).

14    Despite the BOP's efforts to control the spread of COVID-19, the record before

15  the court demonstrates defendant cannot comply with the CDC's recommendations while

16  incarcerated at FCI Lompoc and with his underlying conditions he is more vulnerable to serious

17  illness or death if reinfected with COVID-19.  First, the identified cases of COVID-19 at FCI

18  Lompoc among the inmate population with which defendant is housed, and the spread at the

19  neighboring institutions, is significant.  *See* BOP, *COVID-19 Cases* (updated daily).[12]  As of

20  defendant's filing of his motion there had been a total, at FCI and USP Lompoc, of four inmate

21  deaths, 960 inmates and 40 staff members designated as "recovered" at this institution.  *Id.*

22  (accessed September 16, 2020).  As of this writing, the number of inmates designated as

23  "recovered" is lower than when filed, at 902 and there has been one additional inmate death.  *Id.*

24  (accessed October 2, 2020).  While these are the numbers available, this court in *United States v.*

25

26    [11] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/what-you-can-
do.html (last updated September 11, 2020) (accessed October 2, 2020).

27    [12] https://www.bop.gov/coronavirus/ (reporting three staff members at FCI Lompoc

28  Medium and four staff members at USP Lompoc, have tested positive for COVID-19).

*Pickard* has expressed skepticism regarding the "suggestion that more than 900 active infections were resolved within two weeks."  2020 WL 4227510, at *4 (E.D. Cal. July 23, 2020); *United States v. Schweder*, No. 2:11-CR-00449-KJM, 2020 WL 5257598, at *5 (E.D. Cal. Sept. 3, 2020) (same; collecting cases).  Second, defendant argues he is "housed with large numbers of other prisoners" where he "live[s] and sleep[s] in a group setting where physical distancing is impossible."  First. Suppl. Mot. at 11.  There is no evidence in the record to suggest BOP's measures have improved or are proving effective in preventing COVID-19 exposure for defendant.  *See* Suppl. Ex. A ("BOP Inspection Report") ¶¶ 10, 14, 20, 35, ECF No. 96-1;[13] *see also* Dep't of Justice Pandemic Response Report.[14]  As noted, the government does not dispute defendant's health conditions "technically," do increase his risk of severe illness from another bout with COVID-19 as set forth by the CDC.  Opp'n at 10 (citing CDC, *Coronavirus Disease 2019 (COVID-19)–People Who Are at Higher Risk*).[15]

Considering the totality of the record, the court finds defendant's living conditions and the situation at his institution are such that defendant is likely unable to engage in the self-care required to protect himself against contracting COVID-19, as prescribed by reputable public health authorities.  These living conditions, and defendant's comorbidities, including asthma, chronic kidney disease, hypertension and obesity, put him at high risk of serious illness or death if he contracts COVID-19 again.  The court finds this suffices to show an "extraordinary and compelling reason" to grant defendant compassionate release.

---

[13] Defendant submitted a report by Dr. Homer Venters appointed by U.S. District Court Judge Consuelo B. Marshall, Central District of California, to inspect BOP's facilities at USP and FCI Lompoc.  The report was published Friday, September 25, 2020 (documenting shortage of medical staff at FCI and USP Lompoc and ineffective COVID-19 screening and isolation process at both facilities).

[14] Remote Inspection of Federal Correctional Complex Lompoc, issued July 23, 2020. https://oig.justice.gov/reports/remote-inspection-federal-correctional-complex-lompoc (accessed October 2, 2020) (same).

[15] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last updated September 11, 2020) (accessed October 2, 2020).

1          4.        Sentencing Guidelines

2                 The Sentencing Guidelines instruct "the court should consider the sentencing

3    factors set forth in 18 U.S.C. § 3553(a) when deciding a motion for compassionate release, and

4    the [c]ourt should not grant a sentence reduction if the defendant poses a risk of danger to the

5    community, as defined in the Bail Reform Act." *Esparza*, 2020 WL 1536155, at *3 (citing

6    U.S.S.G. § 1B1.13); *see also* 18 U.S.C. § 3582(c)(1)(A).

7                 Defendant argues his situation fits under U.S.S.G. § 1B1.13 cmt n.1(A)(ii), which

8    provides that a reduction in sentence is warranted if defendant is "suffering from a serious

9    physical or medical condition" that "substantially diminishes the ability of the defendant to

10   provide self-care within the environment of a correctional facility and from which he or she is not

11   expected to recover."  First Suppl. Mot. at 19.  In its opposition, the government argues defendant

12   has not shown he is not a danger to the community and the court appropriately sentenced

13   defendant to a 120-month sentence, which was the low end of the advisory guidelines range.

14   Opp'n at 13–14 (citing, *inter alia*, *United States v. Zaragoza*, No. CR-08-0083 PJH, 2008 WL

15   686825, at *3 (N.D. Cal. Mar. 11, 2008) ("In assessing danger, physical violence is not the only

16   form of danger contemplated by the statute.  Danger to the community can be in the form of

17   continued narcotics activity or even encompass pecuniary or economic harm.").

18                 In reply, defendant argues at the time he was sentenced, this court was bound by

19   the mandatory minimum penalty of 10 years.  Reply at 11 (citing Pre-sentence Report,

20   ECF No. 43, at 13 ("The minimum term of imprisonment is 10 years," relying on 21 U.S.C.

21   § 841(b)(1)(A)).  As defendant correctly notes, in 2018, however, the "safety valve was expanded

22   in the First Step Act"[16] and were defendant sentenced today, he would not be subject to the

23

24          [16] "(f) Limitation on applicability of statutory minimums in certain cases.--
     Notwithstanding any other provision of law, in the case of an offense under section 401, 404, or
25   406 of the Controlled Substances Act (21 U.S.C. 841, 844, 846), section 1010 or 1013 of the
     Controlled Substances Import and Export Act (21 U.S.C. 960, 963), or section 70503 or 70506 of
26   title 46, the court shall impose a sentence pursuant to guidelines promulgated by the United States
     Sentencing Commission under section 994 of title 28 without regard to any statutory minimum
27   sentence . . ." 18 U.S.C.A. § 3553(f).

28

13

1   mandatory minimum.  Reply at 12 (noting defendant's request for time served sentence of 50

2   months would not be large departure from the 62 month sentence a person today would receive

3   for same offense with same criminal history as defendant).  Moreover, defendant argues if the

4   court evaluates defendant's danger to the community based on criteria applied at the time of

5   sentencing and not based on post-offense developments under § 3553(a), it would essentially

6   nullify the purpose and spirit of the Compassionate Release Act.  First Suppl. Mot. at 24; Reply at

7   12 (noting strongest reason defendant is not risk to public is his fear of return to prison where he

8   could be subject to heightened dangers of COVID-19 again).

9          Defendant's crime is indisputably a serious one, but it was nonviolent.  Defendant

10  has served four years, three months and eighteen days, or approximately 49. 8 percent of his

11  statutory term; if good time credits are applied, he is eligible for home detention beginning June

12  14, 2024.  Public Inmate Data at 3–4.  Other courts have found similar sentence reductions

13  allowable prior to completion of statutorily mandated terms.  *United States v. Bess*,

14  No. 16-CR-156, 2020 WL 1940809, at *11 (W.D.N.Y. Apr. 22, 2020), *appeal withdrawn,*

15  No. 20-1491, 2020 WL 4496494 (2d Cir. May 29, 2020) (defendant released prior to completion

16  of his statutorily-mandated term of 60 months, court found no indication in the text of section

17  3582(c)(1)(A) that courts are limited to offering compassionate release only to inmates who have

18  satisfied statutory-minimum terms); *id*. n.11 (collecting cases finding same); *United States v. Ben-*

19  *Yhwh*, No. CR 15-00830 LEK, 2020 WL 1874125, at *5 (D. Haw. Apr. 13, 2020) (granting

20  defendant's motion for compassionate release, notwithstanding 60-month mandatory minimum

21  term of imprisonment, and "plac[ing] [him] on home confinement without electronic monitoring

22  for a period of home confinement equal to the remaining term of his original sentence of

23  incarceration" after defendant served eight months).

24          The government does not dispute defendant's purported exemplary record while in

25  prison, with no disciplinary incidents.  Opp'n at 14.  During his four years at BOP defendant has

26  earned good time credits and avoided disciplinary incidents.  Public Inmate Data at 4; *see United*

27  *States v. Parker*, No. 2:98-CR-00749-CAS-1, 2020 WL 2572525, at *11 (C.D. Cal. May 21,

28

1    2020) (finding evidence of defendant's rehabilitation weighed in favor of granting motion for

2    compassionate release; collecting cases).

3             The court has reviewed all the factors to be considered in imposing a sentence, 18

4    U.S.C. § 3553(a), and finds "reducing [defendant's] sentence would not be an abrupt departure

5    from [defendant's] current sentence." *United States v. Applewhite,* No. 08-CR-60037, 2020 U.S.

6    Dist. LEXIS 5376, 2020 WL 137452, at *2 (D. Or. Jan. 13, 2020) (alteration in original; internal

7    quotations omitted).  Moreover, no factor or combination of factors precludes the requested

8    remedy here, particularly given defendant's evidence of rehabilitation.  *See generally* Release

9    Plan Questionnaire, which defendant has submitted to the court.  *See* Not. of Req. to Seal, ECF

10   No. 94.[17]  The court has conferred with the probation office, which will be supervising Mr.

11   Fernandez in the Central District of California if he is released.  That office has confirmed Mr.

12   Fernandez's release plan is appropriate.

13             In light of the foregoing, the court finds defendant does not present a risk of

14   danger to the community as contemplated by 18 U.S.C. § 3142(g).  Accordingly, the court

15   exercises its discretion to reduce defendant's sentence as described below, because extraordinary

16   and compelling reasons support the reduction.  While the government has requested an

17   opportunity to brief appropriate conditions, including a release plan and a period of home

18   confinement, the court imposes those conditions with no need for further briefing.  To the extent

19   the government requests a period of quarantine be imposed prior to defendant's release from

20   BOP, Opp'n at 15 (citing 18 U.S.C. § 3582(c)(1)(A)), this request is DENIED.  *See United States*

21   *v. Scparta*, No. 18-578, 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020).  The court does order

22   Mr. Fernandez to self-isolate for fourteen days in his brother's home.

23   /////

24   /////

25   /////

26

---

27             [17] The court GRANTS defendant's request to seal Exhibit A, ("Release Plan
     Questionnaire") to protect his family private information and the court directs the Clerk to file
28   this document under seal concurrently with this order.

IV.     <u>CONCLUSION</u>

For the foregoing reasons, defendant's motion for compassionate release is GRANTED as follows:

The court modifies defendant's previously imposed sentence of incarceration of 120 months to time served, with the added special condition of supervised release for six months and defendant be subject to home confinement with defendant's bearing the attendant cost of location monitoring.

There being a verified residence and an appropriate release plan in place, this order is stayed for up to fourteen days to make appropriate travel arrangements and to ensure defendant's safe release.  Defendant shall be released as soon as appropriate travel arrangements are made, and it is safe for the defendant to travel.  The court orders Mr. Fernandez to self-isolate for fourteen days in his brother's home, once he arrives there.

In addition to other court-imposed conditions of release, defendant's previously imposed conditions apply and movement in the community shall be restricted as follows, with all activities subject to pre-approval by the probation officer: defendant shall be restricted to his residence at all times except for employment, education, religious services, medical, substance abuse or mental health treatment, attorney visits, court appearances, court-ordered obligations, or other activities as pre-approved by the probation officer.

The court GRANTS defendant's requests to seal defendant's medical records and release plan questionnaire.

This order resolves ECF Nos. 85, 88, 89, 94, 95.

IT IS SO ORDERED.

DATED:  October 5, 2020.

_____
CHIEF UNITED STATES DISTRICT JUDGE